Exhibit 1

Case 2:14-cr-00338-GW  Document 4203-1  Filed 03/22/21  Page 2 of 64  Page ID #:37460
Case 2:14-cr-00338-GW  Document 4089  Filed 03/07/21  Page 2 of 64  Page ID #:32452

1

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION |
| 3 | HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE |
| 4 | |

```
 5  UNITED STATES OF AMERICA,            )
                                        )
 6                  Plaintiff,          )
                                        )              Case No.
 7       vs.                            )     CR 14-00338(B) SJO
                                        )
 8  MARQUIS SHAW,                       )
                                        )
 9                  Defendant.          )
    _____)
10

11

12

13                  REPORTER'S TRANSCRIPT OF
                           SENTENCING
14              WEDNESDAY, OCTOBER 24, 2018
                          10:31 A.M.
15                 LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22  _____

23           CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
                 FEDERAL OFFICIAL COURT REPORTER
24              350 WEST 1ST STREET, SUITE 4311
             LOS ANGELES, CALIFORNIA  90012-4565
25                      (213) 894-3539
```

Case 2:14-cr-00338-GW  Document 4203-1  Filed 03/22/21  Page 3 of 64  Page ID #:37461
Case 2:14-cr-00338-GW  Document 4089  Filed 03/02/21  Page 3 of 64  Page ID #:32463

2

1        **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        NICOLA T. HANNA
         United States Attorney
5        BY:  MACK JENKINS
         BY:  MAX B. SHINER
6        BY:  ARON KETCHEL
              Assistant United States Attorneys
7        United States Courthouse
         312 North Spring Street
8        Los Angeles, California 90012
         (213) 894-2091
9        (213) 894-3308
         (213) 894-1019
10

     **FOR THE DEFENDANT:**
11
         LAW OFFICE OF RICHARD W. RAYNOR
12       BY:  RICHARD W. RAYNOR
              Attorney at Law
13       409 North Pacific Coast Highway, Suite 280
         Redondo Beach, California 90277
14       (424) 257-0284

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

3

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, OCTOBER 24, 2018

 2                              10:31 A.M.

 3                              --oOo--

 4              THE COURTROOM DEPUTY:  Calling Item No. 3:

 5   Case number CR 14-00338(B) SJO; United States of America versus

 6   (Defendant No. 4) Marquis Shaw.

 7         Counsel, please state your appearances.

 8              MR. SHINER:  Good morning, Your Honor.  Max Shiner,

 9   Mack Jenkins and Aron Ketchel for the United States.

10              THE COURT:  Good morning.

11              MR. JENKINS:  Good morning.

12              MR. RAYNOR:  Good morning, Your Honor.  Richard

13   Raynor on behalf of Marquis Shaw, who is present, in custody.

14         Shall we approach the lectern?

15              THE COURT:  Yes, please.

16         So the matter is here for purposes of sentencing.  The

17   Court has reviewed various documents and pleadings in reference

18   to today's sentencing, which included the presentence

19   investigation report prepared by the probation officer.  The

20   report was prepared on May 4th, 2018 and then revised on

21   October 15th, 2018.

22         The Court has reviewed the confidential letter

23   recommendation to the Court by the probation officer and then

24   the addendum to the presentence report.  I have reviewed the

25   Government's pleading regarding the presentence investigation
```

Case 2:14-cr-00338-GW  Document 4203-1  Filed 03/22/21  Page 5 of 64  Page ID #:37463
Case 2:14-cr-00338-SVW  Document 3889  Filed 03/30/21  Page 4 of 64  Page ID #:32913

4

1    report and then the Government's position regarding sentencing.

2         The Court has also reviewed Mr. Raynor's sentencing

3    memorandum; Mr. Raynor's objections to the presentence

4    investigation report; the Government's response to defendant's

5    objections, with attached exhibits; and then additional letters

6    offered on behalf of Mr. Shaw.

7         So let's start with the presentence investigation report

8    and the addendum.

9         Mr. Shaw, have you had an opportunity to review that

10   report with your counsel?

11              THE DEFENDANT:  Yes, sir.

12              THE COURT:  And did you read the contents of the

13   report yourself?

14              THE DEFENDANT:  Yes, sir.

15              THE COURT:  And the addendum thereto also?

16              THE DEFENDANT:  Yes, sir.

17              THE COURT:  And do you feel you've had enough time

18   to consult with counsel before sentencing today?

19              THE DEFENDANT:  Yes, sir.

20              THE COURT:  Did you understand the contents of the

21   report?

22              THE DEFENDANT:  Yes, sir.

23              THE COURT:  And were you able to read the

24   Government's pleading in the case?

25              THE DEFENDANT:  Yes, sir.

Case 2:14-cr-00338-GW Document 4203-1 Filed 03/22/21 Page 6 of 64 Page ID #:37464
Case 2:14-cr-00338-GW Document 4089 Filed 03/02/21 Page 5 of 64 Page ID #:32610

5

```
 1              THE COURT:  The Government has taken a very

 2   different position from Mr. Raynor in terms of the appropriate

 3   sentence in the case.  You recognize that?

 4              THE DEFENDANT:  Yes, sir.

 5              THE COURT:  And have you been able to read your

 6   counsel's pleading, your attorney's pleading?

 7              THE DEFENDANT:  Yes, sir.

 8              THE COURT:  So just to capsulize quickly, and then

 9   I'll turn it over to the Government to supplement or add to any

10   of the objections that I may not have included in the summary

11   here, the Government is -- well, let me start with the

12   presentence investigation report.  The PSR determined that the

13   total offense level is 37, criminal history category is VI.  In

14   the PSR the probation officer determined that defendant was a

15   career -- qualified as a career offender.

16        The defendant has 18 criminal history points.  And because

17   he, according to the probation officer, is a career offender,

18   the guideline range is 360 at the low end to life imprisonment.

19   And the probation officer determined that there was no other --

20   there were no factors that would warrant a departure or

21   variance.

22        So the Government has taken the position that the

23   appropriate sentence in the case is a sentence of 420 months,

24   16 years of supervised release with certain special conditions.

25   The Government, I believe, claims that the maximum supervised
```

Case 2:14-cr-00338-GW Document 4203-1 Filed 03/22/21 Page 7 of 64 Page ID #:37465
Case 2:14-cr-00338-GW Document 4089 Filed 13/60/21 Page 6 of 64 Page ID #:32467

6

1    release that can be imposed in the case is 16 years.

2        The Government made various objections to the presentence

3    investigation report.  The Government objected to the fact that

4    the presentence investigation report did not include certain

5    trial exhibits that were provided by the Government to the

6    probation officer, including the recorded statement by the

7    defendant on 6/2/2012 that took place in co-defendant Lord

8    Kelly's house, where the defendant is heard -- it's a recorded

9    statement so there's a transcript, is heard planning to

10   shoot -- in talking about shooting rival 62 East Coast gang

11   members at a hood party, and in the recording the defendant

12   also mentions other violent acts he has encouraged others to

13   do.

14       The Government also points out that the probation officer

15   didn't make reference or include certain photos that were

16   provided by the Government to the probation officer, including

17   the photo taken on 2/28/2012, which was a photograph taken in

18   the kitchen area of the defendant's location where a drug

19   transaction was taking place.  And in the kitchen area there

20   were stacks of money that appeared to be in an amount involving

21   several thousands or tens of thousands of dollars.

22       The Government also objected to other evidence not being

23   referenced in the PSR, including defendant's involvement in a

24   March 2003 murder of L.R. and then a May 2012 murder of W.S. at

25   an East Coast Crip gang party.

Case 2:14-cr-00338-GW  Document 4203-1  Filed 03/22/21  Page 8 of 64  Page ID #:37466
Case 2:14-cr-00338-GW  Document 3989  Filed 03/04/21  Page 7 of 63  Page ID #:32426

7

1    The Government objected also to the drug quantity

2    guideline calculations in the PSR.  In the PSR, the probation

3    officer found or held the defendant responsible for only

4    87.9 grams of crack cocaine based on cocaine sold by the

5    defendants -- by the defendant on five occasions.  The

6    Government has pointed out in their pleading that the

7    87.9 grams of drug sales does not include or ignores all of the

8    other drug sales that the defendant should be held responsible

9    because of the joint relationship he held with other gang

10   members in the sale of crack cocaine and cocaine and his

11   involvement in the overarching Broadway Gangster Crips activity

12   in terms of selling crack cocaine for a number of years.

13       So the Government argues in their pleading that the clear

14   and convincing evidence establishes that the defendant should

15   be held responsible under the sentencing guideline, and I

16   believe it's 1B1.3, for at least 2.8 kilograms of cocaine, for

17   a total offense level of 34.  In the PSR the probation officer

18   determined that the base level, based on the drug calculation,

19   would be 25.

20       I think the objection made by the Government is a

21   significant, meritorious objection.  The Court has presided

22   over the trial here, listened carefully and closely to all of

23   the evidence, and it's clear from all of the evidence that the

24   Court received that the defendant was responsible for far more

25   than 87.9 grams of drug sales.  And then we'll have to return

1    to what amount he should be held responsible for.

2         The Government also objected in a footnote, and it was

3    Footnote 29, to the probation officer's failure to account for

4    certain violent acts that were the subject of the trial,

5    including the killing of victim L.R., and Mr. Shaw was

6    convicted of manslaughter for that offense in state court.  And

7    the Government objects that the defendant should also be held

8    responsible for the killing of victim W.S. and the conspiracy

9    to murder East Coast Crip gang members on the May 6th date.

10        The Government also objects to the maximum term of

11   supervised release determined by the probation department.  The

12   Government offers that the Court must impose a minimum

13   mandatory of 8 years.  As I understand the Government's

14   position, it is a minimum mandatory of 8 years, but the Court

15   may impose up to 16 years as to Counts Fifteen and Sixteen, a

16   minimum of 8 years on Count Twelve.

17        The Government, separate and apart from all of the

18   objections, concurs with the other calculations and factual

19   allegations contained in the PSR.  The Government concurs with

20   the PSR's finding that the defendant qualifies as a career

21   offender, which increases his offense level to 37.  He has a

22   Criminal History Category VI, and so the Government concurs

23   with all of that.

24        Mr. Raynor has filed various objections to the presentence

25   investigation report.  Mr. Raynor has taken issue with the

**UNITED STATES DISTRICT COURT**

Case 2:14-cr-00338-GW  Document 4203-1  Filed 03/22/21  Page 10 of 64  Page ID #:37468
Case 2:14-cr-00338-GW  Document 2683  Filed 03/30/19  Page 10 of 59  Page ID #:32366

9

1    conclusion by the probation officer that the defendant

2    qualifies or meets the criteria for career offender status.  So

3    the defendant -- or Mr. Raynor objected to the PSR's

4    application of the career offender guideline for a number of

5    reasons:  the first, Mr. Raynor indicates that the offense that

6    was a predicate offense for career offender status, the 1994

7    felony conviction for 11359 H&S, sale of marijuana, was -- that

8    sentence was reduced to, in a nunc pro tunc order by the

9    superior court, to an infraction.  Mr. Raynor also indicates

10   that the 11359 conviction is too old to be counted for criminal

11   history points for career offender consideration.

12        The probation officer has addressed the objections made by

13   Mr. Raynor regarding the conviction under 11359, the 1994

14   felony conviction.  The Government has also addressed that in

15   their pleading -- one second.

16        Mr. Raynor has also taken the position that the other

17   felony offense for voluntary manslaughter is not a crime of

18   violence within the meaning of the career offender guidelines.

19   Also, there's an issue as to whether there's an additional

20   proof that must be offered up by the Government regarding the

21   prior felony drug convictions filed pursuant to Title 21 U.S.

22   Code Section 851.  The defendant or counsel has contested the

23   allegations of the prior felony drug convictions.

24        Defendant also objected to the PSR's failure to calculate

25   a reduction for acceptance of responsibility.  And then

```
 1   Mr. Raynor made various objections to certain inaccuracies --
 2   alleged inaccuracies in the PSR.  And the Court is inclined not
 3   to address those other inaccuracies because they're not
 4   important to the issue of sentencing.
 5        So this is a very serious case.  As mentioned, the Court
 6   had an opportunity to carefully consider all of the evidence
 7   that has been presented in the case in the Court of the trial,
 8   to listen carefully to the witnesses who testified, carefully
 9   evaluate the evidence.  So in reference to the conduct that the
10   defendant should be held responsible for, the standard that
11   applies to sentencing is not the beyond the reasonable standard
12   that applies to a jury trial, but the clear and convincing
13   standard.
14        And so that I can direct counsel in reference to the
15   issues, it appears to the Court, based on my evaluation of all
16   of the evidence, that the defendant should be held responsible
17   for the March 10th, 2003 murder of L.R., or the killing of L.R.
18   Mr. Shaw was convicted of this count in reference to state
19   court proceedings.  And the evidence was very strong that
20   Mr. Shaw participated in the killing of that victim.
21        Separate and apart from the killing of the victim, the
22   evidence was extremely strong that the defendant thereafter led
23   the police on a high-speed chase through West Hollywood and
24   Beverly Hills in an attempt -- the persons in the vehicle with
25   Mr. Shaw attempted to dispose of the weapon, the gun used to
```

1  kill the victim, and that was L.R.  The weapon was later

2  recovered after it was disposed of in somebody's backyard.

3       The Government has taken the position that the defendant

4  should be held responsible under a clear and convincing

5  standard for the murder of W.S., in referencing that Mr. Shaw's

6  role in the murder was one of the drivers who supervised the

7  shooting of that person.

8       The Government has taken the position that the defendant

9  should be held responsible also for the conspiracy to shoot and

10 kill 62 East Coast Crips as documented in the recording that

11 was provided and played in open court, and then a transcript of

12 certain parts of that recording are included in the

13 Government's pleading as Exhibit A and Exhibit B.

14      The Government also believes that the defendant should be

15 held responsible, at least for purposes of sentencing, for acts

16 of violence that were committed while he was in custody

17 involving rival gang members, or at least discussions regarding

18 orchestrating assaults on rival gang members while he was in

19 custody.

20      And the Government has taken the position that the

21 evidence is compelling regarding him being responsible for the

22 distribution of multiple kilograms of cocaine, and the evidence

23 being not only was the defendant a user or supplier -- let's

24 put aside user, certainly a supplier, but also a person who

25 manufactured cocaine.

12

1    In part, in support of the claim that the defendant should
2    be held responsible for far more cocaine than what was
3    attributed to him in the PSR, the Government has pointed to the
4    arrest of the defendant -- the detention of the defendant in
5    January of 2002 in Nebraska where he was traveling with another
6    BGC member.  I believe that was Mark Keith.  And they were
7    traveling to -- on a Greyhound.

8    They were intercepted by police officers in Nebraska, and
9    they were -- it was determined that one of the bags that was
10   being carried, a duffle bag that was being carried by Mr. Mark
11   Keith, who was accompanying the defendant, contained a kilo of
12   cocaine.  And the evidence, I think, is clear to the Court that
13   Mr. Shaw was working in concert with Mr. Keith in reference to
14   transporting that substance.

15   And then separate and apart from the Nebraska incident,
16   the number of years that the defendant was involved with the
17   Broadway Gangster Crips in his role as a supplier and
18   manufacturer and the evidence involving the tens of thousands
19   of dollars that appeared in his kitchen on the date and time
20   that he was engaged in one transaction reflect large amounts of
21   cocaine distribution, I think far more than the Government has
22   referenced in their pleading.

23   I think the Government's -- I think the Government
24   believes he should be held at least responsible for 2.8, and
25   certainly I think the evidence probably supports more than

**UNITED STATES DISTRICT COURT**

13

1   2.8 kilograms, but the Court has to apply a clear and

2   convincing standard to determine precisely the amount.  And the

3   Court can engage in estimates for sentencing purposes.

4       I'm really concerned about the defendant's claim that he

5   has accepted responsibility for his acts.  I see nothing in the

6   record to reflect any acceptance of responsibility for

7   Mr. Shaw's conduct in any of the cases or any of the acts that

8   were referenced in the course of the trial.

9       I do think that there are certain issues that need to be

10  addressed regarding his career offender status, and the issue

11  involving the prior marijuana sale, drug sales conviction that

12  was reduced.  And I think we also -- I think I also need to

13  hear from Mr. Raynor regarding the number or amount of drug

14  transactions that defendant should be held responsible for.

15      I certainly respect the jury's involvement in the case,

16  and I think that we had some extremely, I think, bright people

17  on the jury.  That being said -- and I'm a 100 percent believer

18  in the jury system.  I think the jury gets it right in the vast

19  majority of cases, but with all of the overwhelming evidence in

20  this case, I don't understand how the jury did not return a

21  verdict in terms of the RICO conspiracy in favor of the

22  Government here.

23      So there are issues to be discussed and additional

24  objections that need to be ruled on and an issue of whether

25  there's additional proof that's required for the 851.  So I

1   probably should start with the Government first.

2           MR. SHINER:  Yes, Your Honor.  Thank you.

3       I'll try to go through each of those issues that you

4   raised.

5           THE COURT:  Yes.  In reference to the second -- I

6   should say in reference to the second murder, we had the murder

7   of L.R., and Mr. Shaw's involvement in the murder of L.R. is

8   pretty clear.  Then we have the murder of W.S. and Mr. Shaw's

9   role in that murder of W.S.  So I think I have more concern

10  with the issue involving the May 2nd, 2012 murder of W.S.

11          MR. SHINER:  Understood.

12      If I could backtrack and just address the PSR addendum

13  first because there's some more minor issues that I think we

14  need to address.

15          THE COURT:  Please.

16          MR. SHINER:  The first is the issue of supervised

17  release.  This Court has applied the correct rule in the past.

18  In fact, it sentenced Tracy Harris to a 16-year term of

19  supervised release in that case.  The Government objected to

20  the PSR in stating that -- which stated that it was a minimum

21  of 8 years supervised release and didn't state the maximum.

22  That is not correct.  It's a minimum of 16 years on Counts

23  Fifteen and Seventeen due to the operation of Section 860,

24  which doubles the supervised release term provided in 841.

25      Again, in the addendum the probation officer took a

**UNITED STATES DISTRICT COURT**

1    conservative approach or read the statute in a different way

2    than the Government reads it, that the Court read it in the

3    last sentencing, and that in all the cases I found, the appeals

4    courts have read it.  And just for the record, I'd point the

5    Court to *U.S. versus Carter*, a Tenth Circuit case 172 Federal

6    Appendix 883, at Page 888, where the Court found that 860 did,

7    indeed, raise the minimum term provided in Section 841.

8          So the minimum term in 841 here was raised from 4 years to

9    8 years because of the 851 prior.  Either one of them did that,

10   and because of the 860, it is 16 years minimum.  The maximum is

11   life.  So the Court did, I believe, just misspoke in stating

12   that the maximum is 16 years.  I believe it's correct to say

13   that the minimum is 16 years.

14         And also with regard to the addendum, we've had this same

15   discussion in other sentencings in this matter, and it's

16   evident to the Government that we just have a different

17   understanding of how the probation office should write its

18   reports.  It's clear the probation officer has at least a

19   practice of not including certain enhancements or normally not

20   including any enhancements that aren't either in a factual

21   basis in a plea agreement or literally encompassed by elements

22   of the offense of conviction.

23         As we discussed at length in our briefing, that is not how

24   the guidelines work.  And if the PO is taking that position,

25   then they are not doing a full evaluation of the guidelines.

16

1    They are just letting that be the job of the Court, which is
2    fine, but they simply did not review or discuss in any level of
3    detail defendant's involvement in the violence, in the murders,
4    or the conspiracy liability for all the drugs that was
5    extensive and detailed at trial.
6        And it wasn't just detailed in trial.  I think it would be
7    hard -- we would be hard pressed to find a factual scenario
8    after several years of litigation in a large case like this
9    where the strength of the Government's evidence that the gang
10   did, in fact, engage in a conspiracy to distribute crack
11   cocaine, that was essentially made up of many smaller
12   individuals distributing crack cocaine by taking advantage of
13   the gang's power and hold over this neighborhood.
14       Just as was found in *U.S. versus Rodriguez*, which we cited
15   in our brief, the First Circuit case that said the success of
16   each member's drug operation depended on the overall security
17   of the housing project here to the overall success of every
18   defendant's drug trafficking in that area.  And defendant's
19   drug trafficking, some of it did occur in that area, and much
20   of it did occur by selling to other BGC members.  That does
21   lead to conspiracy liability.  So that is the basis for our
22   position on the at least 2.8 kilograms of crack cocaine.
23       I think the facts relating to defendant's own conduct
24   support that, as well as the Court noted in your tentative
25   remarks.  Way back in -- I believe it was 2001, he was

 1   transporting a kilogram of powder cocaine through Nebraska with

 2   another BGC member, Mark Keith.  And we know that he does

 3   manufacture crack cocaine from powder cocaine from his own

 4   remarks in recorded buys.  So I think that by clear and

 5   convincing evidence, those findings can and should be made.

 6          The overall approach by the probation office of the

 7   sentencing guidelines is to essentially ignore certain

 8   sentencing enhancements if they are not proved or found by the

 9   jury, but as you noted, even for the most serious enhancement,

10   the standard under the guidelines is clear and convincing

11   evidence.  And I take it from your remarks you found -- that

12   you are tentatively finding that there is clear and convincing

13   evidence in certain of the murders, including the murder of

14   L.R.  The Government agrees.

15          We addressed the guidelines calculation with drug

16   quantity, replaced our position of those murders in that

17   footnote because we do believe that the guidelines should

18   encompass that, but we primarily addressed the murders under

19   3553(a), and that is our position, that they're relevant to

20   both of the guidelines determination and the 3553(a) weighing

21   of all of the facts involved in defendant's sentencing.

22          The guidelines provide for a 360-to-life range because

23   he's a career offender, but even without that, it would be

24   nearly 360 to life because of either of the finding that this

25   defendant's relevant conduct involved murder or a great amount

```
 1    of crack cocaine.  And if the guidelines are to mean anything,

 2    they are to mean that they give the Court discretion to impose

 3    any sentence within the guidelines if the Court, after weighing

 4    the 3553(a) factors and what other factors the Court deems

 5    important, are within that range.

 6         So while the Government's position is that the 35 years is

 7    appropriate and it, as the Court noted, diverges greatly from

 8    defendant's request, it is a within-guidelines sentence.

 9         The murder of L.R. was, I believe, as the Court noted, was

10    extensively discussed at the trial.  There was a great deal of

11    evidence of it, and some of it is essentially conclusive.

12    What's conclusive is that defendant participated in it, and he

13    killed L.R.  He admitted that in a guilty plea to voluntary

14    manslaughter as part of a what appears to be a somewhat

15    favorable plea deal in state court.

16         What's also essentially unrefuted is that the victim's car

17    was shot at by both sides, not only from defendant and his

18    colleagues in his car, but from another car on the other side

19    almost simultaneously.  That alone, in the Government's view,

20    makes it very difficult to understand how this could be either

21    a self-defense case or purely a voluntary manslaughter case.

22    That evidences some type of premedication and deliberation, and

23    at the very least, willful conduct on everyone that opened fire

24    on that car.  There were no shots coming from the victim's car.

25    The self-defense claim was fairly, in the Government's view,
```

19

1   almost verging on the absurd.

2        The William Sherman murder was one that was greatly

3   corroborated in great detail but did rest on the initial

4   information provided by the informant, the informant ██CI██

5   ████. ███CI███ spent the greater part of two days on

6   the stand.  I believe he spent seven hours on direct

7   examination and many more hours on cross, and in my experience,

8   I've never found an informant whose role in the case was so

9   well corroborated and whose information led to more solid

10  evidence resulting in the indictment and conviction of more

11  defendants.

12       Essentially 72 defendants' cases in this case rested more

13  or less on what ███CI███ told the FBI and what ██CI██

14  ████ told the FBI about the W.S. murder, the William Sherman

15  murder, was who was involved because they told him, and he

16  reported it to the FBI:  where they did it, how they did it,

17  and even what guns they used, and who fired what guns.  All of

18  that information was corroborated by hard evidence uncovered by

19  the FBI.

20       Three of the guns that were used in that shooting were

21  recovered to the next day at a house where Ravon Murrley was.

22  Ravon Murrley was one of the shooters.  He was in possession of

23  two of the guns at that house.  The informant's statement that

24  Ravon Murrley told him he shot an Uzi was corroborated by the

25  recovery of that Uzi at that house and the recovery of a second

UNITED STATES DISTRICT COURT

1    gun matching the description of a gun another shooter used.

2         A third gun was recovered from Joshua Perez.  Joshua Perez

3    was linked to that gun because it was in his car, but also

4    because that gun was linked to the shooting through ballistics

5    and that Joshua Perez's own cell phone showed that he traveled

6    to and from that shooting scene within a matter of minutes

7    precisely at the time of that shooting, from the BGC area, on

8    the very night in question and on no other night in the time

9    span that the records have.

10        Joshua Perez, it's no small thing, pled guilty and

11   admitted his role in that murder primarily because of the

12   information that [CI] gave, which was corroborated.

13   But it wasn't only that [CI] explained how -- why the

14   murder occurred, that the murder of Donovan Hoover was the

15   impetus, that there was another shooting the night after

16   Donovan Hoover's murder that predicted the investigators

17   learning that, yes, indeed, another shooting did occur in East

18   Coast Crips territory conducted by people in a car, a green

19   car, that met the description that [CI] gave.

20        The one remaining factor -- the one remaining fact

21   relevant to this case to the defendant was that [CI]

22   also told the FBI who drove and supervised on that murder.  It

23   was Aaron Shaw and defendant Marquis Shaw.

24        Every aspect of his account that could have been

25   corroborated by investigation essentially was corroborated.  So

1  if we're looking at this by clear and convincing evidence,

2  ███ CI ███'s testimony, tested on cross-examination for

3  hours and hours regarding this event, is more than compelling

4  enough to provide clear and convincing evidence that Marquis

5  Shaw was involved in that shooting.

6      We discussed acts of violence caught on videotape or

7  discussions about acts of violence, the encouraging of acts of

8  violence by others by Defendant Shaw, and I will discuss those

9  primarily in terms of the 3553(a) factors because

10 Defendant Shaw was caught on video advocating and planning the

11 shooting of rival East Coast Crip members, which was also done

12 in retaliation for the Donovan Hoover shooting.

13     ███ CI ███ also testified that that very night of that

14 recording he made, the gang did try to go out and commit that

15 shooting because he reported that to the FBI and the LAPD.  The

16 LAPD was able to flood the area with cars and stop any shooting

17 from occurring, but what ███ CI ███ said was that Marquis

18 Shaw was down in the area, and he was upset that there were too

19 many police and they couldn't go through with it; they couldn't

20 hit that party.  And because of that, he thought there might

21 have been a snitch involved, and he told that to ███ CI ███

22 or ███ CI ███ learned that from him.

23     His violence, defendant's violence, was not just that

24 shooting, wasn't just the 2003 shooting of Luis Roches, the

25 2012 shooting of William Sherman; it was a way of life and

**UNITED STATES DISTRICT COURT**

22

1   ethos for this defendant.  This defendant, who started his

2   sentencing memorandum by saying he was a part-time drug dealer

3   and a person after he got out of prison never attended gang

4   meetings, is caught at a meeting on Lord Kelly's porch

5   discussing how he engages in gang-related violence in and out

6   of custody.  In custody he's taking on East Coast Crip members.

7   And it's not just bragging, Your Honor.  What it is is teaching

8   other members of the Gremlin cliques what it is to be a good

9   Broadway.

10          This defendant, in our assessment, the Government's

11  assessment, is the most violent individual that we know of in

12  this case.  The lead defendant in this case, Tyrine Martinez,

13  pled guilty and was sentenced to 22-1/2 years primarily because

14  he conspired to kill other members of his own gang on

15  suspicions that they were snitches.

16          Tyrine Martinez was a leader of the Gremlin Riderz, a very

17  violent individual, a person that was recorded on tape, a tape

18  that was played in this trial, attempting to recruit another

19  one of his victims, another one of his gang, a third member of

20  the gang for suspicion of cooperating, a person who obtained

21  guns, received guns, gathered guns, constantly talked about

22  retaliating against snitches and members of other gangs, rival

23  gangs.

24          When the gang was going to retaliate for the murder of

25  Aaron Shaw, a member of the BGC, and the FBI and LAPD were able

1  to stop that murder and serving a search warrant and recovering

2  seven of the guns that they were going to use in that plan, the

3  very next day Tyrine Martinez was out trying to gather more

4  guns.  And in a recording with that same CI, said the person he

5  was going to get a gun from was none other than Marquis Shaw,

6  Tiny Loon.

7      Tiny Loon was a member of the Gremlins, a predecessor of

8  the Gremlin Riderz.  Marquis Shaw was Tyrine Martinez before

9  there was a Tyrine Martinez. He was a leader.  He was someone

10  who taught the next generation of Gremlin Riderz what it meant

11  to be a Gremlin Rider.

12      That's why he has no compunction in shooting a person he

13  sees on the street who offended him.  That's why he had no

14  compunction in driving and supervising others to shoot William

15  Sherman in retaliation for a gang shooting.  That's why he

16  stood there on that porch and encouraged others to shoot and

17  kill East Coast Crips gang members with no regard for who they

18  were, endangering the lives of not only gang members, but those

19  in the area, those like William Sherman, who was not a member

20  of the East Coast Crips but died because he was going to the

21  party.

22      I won't belabor this, but with regard to acceptance of

23  responsibility, I have to agree with the Court; I see none of

24  it.  I read the defendant's letter to the Court, and in my

25  quick review of it last night, I saw that it contained the word

24

1   "I" approximately 41 times, and the words "me," "myself" or

2   "my" 39 times, and it contained no discussion of defendant's

3   crimes, the impact of his crimes on others, what his life of

4   commitment to the Broadway Crips meant for the neighborhood and

5   its victims.  It was truly probably the most solipsistic

6   document I have read in connection with a sentencing hearing,

7   and it evinces no acceptance, not even any understanding of the

8   impact of his crimes.  It evinces only a concern for his own

9   fate.

10          With regard to the technical application of the career

11   offender guidelines, again, all of the factors we discussed,

12   the Government is assessing both under the guidelines, but more

13   importantly, under the 3553(a) factors.  And while we are

14   asking for a within-guideline sentence, we would be asking for

15   the same sentence even if the career offender guideline did not

16   apply.

17          And I think I would ask the Court to assess that position

18   and make that finding under 3553(a) as well because of what I

19   just said, this defendant's lengthy involvement in this gang.

20   His extremely long criminal history show that he deserves that

21   sentence whether or not the technical application of the

22   guidelines makes him a career offender.

23          Just as an example of why this defendant is more a career

24   offender than many of the other people in this case who

25   technically qualify because of drug offenses, this defendant

1  had not only two prior drug offenses, but had multiple prior

2  felony convictions involving violence; a domestic violence

3  conviction for which he did a year; a felon-in-possession

4  conviction; the manslaughter conviction that was so discussed

5  in this case where he did seven years; an assault with a deadly

6  weapon; and finally, in 2014, a conviction for assault with a

7  firearm on victim Dawn N., apparently someone who he was in a

8  domestic relationship, for which he received eight years in

9  prison.

10      Most of those crimes that I just recited do not count for

11  the career offender enhancement, but they show that he's more

12  of a career offender than almost anyone in this case.  But the

13  career offender enhancement does apply for the reasons we

14  discussed at length in our brief.  The *U.S. versus Diaz* case

15  makes it very clear.  Courts have followed it.  It's true, some

16  district courts have followed it, but the defendant has not

17  pointed out any courts that found that it does not apply.

18      The defendant in his reply criticizes the Government's

19  reliance on district court cases and then goes on to rely on a

20  district court case in this circuit saying this Court should

21  not follow *Diaz* in applying career offender -- applying *Diaz* to

22  the career offender enhancement.

23      The problem with that is not only does it show he would

24  like to rely on district court cases when it helps him, but he

25  ignores the fact that that case, *Clay*, is on appeal and has

26

```
1   been the subject of an emergency stay from the Ninth Circuit,
2   meaning that the Ninth Circuit has found that there is a strong
3   likelihood of its being overturned on the merits.  And the
4   reason for that is clear.  It's because Diaz does control.
5   Diaz directly conflicts with the position that the court
6   took -- that the other court took in Clay.
7        There's no due process violation in applying a case that
8   has been later reduced from a felony in applying the guidelines
9   or 841/851 enhancements.  Cases are clear on that.  There's no
10  proportionality principles of the due process clause
11  implicated, and the plain text of the statute mandates that
12  they be applied.
13       The other problem with what is in defendant's reply is
14  they rely on a line of cases, I believe Herman, but mostly
15  Johnson versus United States, which relied on Custis, this
16  whole line of cases is a line of cases from the armed career
17  criminal context.  And what they are are cases that say
18  procedurally a defendant can file a 2255.  He's essentially
19  interpreting the AEDPA, the Effective Death Penalty Act, derive
20  standards when 2255 is going to be filed, and they never
21  reached the issue of whether substantively a defendant should
22  or could prevail when a state court prior conviction is later
23  reduced.  They assume without deciding it essential.
24       But the other problem with those AEDPA cases is the text
25  of that statute is different.  The text of that statute is it's
```

```
 1   just a sentencing statute, and it says if a defendant has three
 2   prior convictions, he will be sentenced to a minimum of 15
 3   years.  There is no temporal element like there is in 841, as
 4   explained in Diaz and in the career offender where the standard
 5   is he committed the offense after a felony conviction had
 6   become final.
 7        In this case all of defendant's prior convictions had
 8   become final prior to his commission of the offenses in this
 9   case, and that's the end of the story.  The inquiry is whether
10   they had become final, not whether sometime after the
11   commission of the offenses, sometime after he's being charged
12   in the offenses, sometime after he's able to obtain an attorney
13   and go back to state court and try to undo those convictions he
14   was able to be successful in that endeavor.  No, the question
15   is whether he committed the offenses after prior convictions
16   for felonies had become final.
17        And there's a very good reason for that.  Obviously both
18   841 and career offender statute are aimed at punishing
19   recidivism.  And it would be absurd, indeed it would be
20   counter-productive, if the courts were to rule, which they have
21   not, that a defendant could be charged for committing a
22   subsequent crime, go back to state court, without even
23   revealing the nature of his prior -- or his current case, get a
24   prior conviction reduced or dismissed and then have that affect
25   his sentence in the open pending federal case.
```

1    It doesn't comply with how the courts treat federal

2  sentencing because they are not to be affected by state court

3  proceedings.  It doesn't comply with what constitutes a

4  conviction under federal law because that is not a matter of

5  state law.  And it doesn't comply with common sense because

6  those convictions that a defendant can go back to state court

7  to get reduced under the theory that if he is successful on

8  probation or the cases are old, he no longer poses a threat and

9  no longer needs to have that on his record, while a similar,

10  more serious case is pending, it completely undoes the purpose

11  of the recidivist sentencing statutes.  Indeed, it undoes the

12  purpose of all of the sentencing factors which require the

13  court to take into consideration defendant's background and

14  characteristics and criminal history.

15    (Discussion off the record.)

16    MR. SHINER:  I think I've addressed most of the

17  points that the Court has.  I will be happy to speak on any

18  more, but I would just say, to reiterate our argument regarding

19  the career offender statute, the point that defendant seems to

20  be making is that his conviction is invalid.  It was not

21  invalidated.  It was reduced to a lesser offense.  It still

22  exists.

23    The guidelines make it very clear what constitutes a

24  conviction under the guidelines and that is that it has to be

25  expunged, which means it has to be legally invalid.  There has

1    to be some error of law or constitutional defect.  And what

2    defendant was able to do here is, under a very clear legal

3    framework, have a case reduced in its offense level severity.

4    It was not an error of law; it was purely a legal decision.

5    And that's not the type of expungement that the sentencing

6    guidelines intend to reward.

7        Obviously, in common terms, an expungement means that it

8    never happened because it shouldn't have ever happened because

9    it was unconstitutional or the person was factually innocent or

10    the conviction only happened because of an error of law.  There

11    was no error of law in 1994 when the defendant was selling

12    marijuana.  He pled to that offense.  He was convicted, and he

13    was sentenced to more than a year in prison.  Those events

14    happened.  The historical facts are clear, and the historical

15    facts are what the Court is required to determine.

16        THE COURT:  Just a couple of questions.  In

17    reference to the 16-year minimum mandatory for supervised

18    release, is it your position that it applies to Counts Twelve,

19    Fifteen and Seventeen, all three?

20        MR. SHINER:  It applies to Counts Fifteen and

21    Seventeen.

22        THE COURT:  Only.

23        MR. SHINER:  Because Count Twelve was under 841

24    alone.  That is an 8-year minimum with a life maximum.

25        THE COURT:  And then in reference to the PSR

30

```
 1    calculation base level of 25 based upon the drug quantity
 2    involved, it's your position that it should be 34; is that
 3    correct?
 4              MR. SHINER:  That's correct.
 5              THE COURT:  And it's also your position that the
 6    total offense level remains at 37?
 7              MR. SHINER:  That's correct.
 8         (Discussion off the record.)
 9              MR. SHINER:  Just that is our position.  The Court
10    has tentatively stated that the murder -- at least the murder
11    of Luis Roches should be considered relevant conduct under the
12    guidelines, and in that case the Government would ask that it
13    use the second-degree murder guideline, which would result in
14    an offense level of 38, but I will leave that to the Court.  I
15    do not believe that could be considered a voluntary
16    manslaughter for the reasons I've discussed.
17              THE COURT:  Mr. Raynor, much to discuss.
18              MR. RAYNOR:  Yes, Your Honor.
19         Your Honor, I would like to just first start with -- and I
20    know we are talking here just about the guidelines, and there's
21    going to be additional discussions, but the case against
22    Marquis Shaw for violence, RICO conspiracy, VICAR murder, the
23    drug conspiracy, all of those in which it was alleged a
24    conspiracy or involvement with violence, he was acquitted, and
25    the Government now is attempting, essentially, to relitigate
```

1    the trial and, in part, calling things relevant conduct.

2        Within the definition of relevant conduct, it has to be

3    relevant to the offense of conviction.  The offenses of

4    conviction here are three convictions for distribution of

5    drugs.  He was acquitted of RICO conspiracy and drug

6    conspiracy.  So the question is:  What is relevant conduct to

7    these distribution counts?  Not to an 846, conspiracy, as

8    charged here, with other gang members.  He was not convicted of

9    anything involving gangs.  And in terms of acceptance of

10    responsibility, all that the law requires for acceptance of

11    responsibility is that he accept responsibility for the offense

12    conduct, and he has done that.

13        The allegation that the -- the Government's contention

14    that murder and other violent conduct is relevant conduct to

15    the instances here, there's just not the connection, and it

16    legally cannot be the basis for that to be found as relevant

17    connect.  It's just not sufficient.  If -- perhaps if he had

18    been found guilty of at least one crime involving violence, if

19    he had been found guilty of the RICO conspiracy or the VICAR

20    murder, then perhaps that might be relevant conduct, but

21    there's just no hook to hang that hat on in this case.  And so,

22    therefore, none of those are appropriately considered as

23    relevant conduct.

24        Your Honor, some of the things I'm going to say might

25    sound like repetition, but I think this issue of career

1 offender is one that's very complicated and one that I think we

2 need to go through step by step to discuss its application and

3 spend some time talking about *Diaz*, because the application of

4 career offender in this case in terms of the guidelines has

5 such a disproportionate effect on increasing the guideline

6 sentence.  That is one of the reasons that it has the higher

7 standard of proof, not just proof by a preponderance of the

8 evidence.

9     So I think it's important to understand *Diaz* and

10 understand the limitations of *Diaz*.  And I would like to first

11 clarify something because the Government had said that the case

12 that we cited, the *Clay* case, involved career offender.  It

13 doesn't.  It involves actually 851, and it's a due process and

14 Eighth Amendment claim relating to the 851, but it's an opinion

15 by Judge Fairbank, and what is important there is the

16 discussion about *Diaz* and its limitations.

17     So what is *Diaz*?  Because *Diaz* is the case that was cited

18 by the probation officer as the basis for finding that the

19 marijuana conviction, which had been subject to two challenges

20 and was for certain at least no more than a misdemeanor,

21 whether or not that applies, could be considered a felony drug

22 trafficking offense.

23     So *Diaz*, by its very own terms, is one about statutory

24 construction.  It's about 21 U.S.C. 841, and that's -- and it

25 certainly is not about career offender.  And, in fact, it says

```
 1    that -- it points to instances such as United States Versus
 2    Law, a DC circuit case in which -- I'm quoting from Diaz --
 3    congress could, of course, give retroactive effect to changes
 4    in state law for purposes of federal statutes for policy
 5    reasons unrelated to innocence or errors of law, and it goes
 6    on, it has done so in other circumstances and cites to United
 7    States versus Yepez.  And there it says -- that case is
 8    discussing carve-outs in the U.S. sentencing guidelines.  And
 9    so it says that it has done so in other circumstances, but in
10    841 congress did not.
11        So Diaz talks about what are we looking at in terms of if
12    an offense was reduced under Prop 47?  What matters is at the
13    time of the offense conduct or later at the time of sentencing,
14    and it said that what matters is at the time of the offense
15    conduct.  That's what it says.  However, it's interpreted for
16    purposes of 851.  For certain it does not, by its very terms,
17    Diaz does not apply to career offender because career offender
18    specifically has carve-outs, the very carve-outs -- they're
19    saying 841 does not have these carve-outs.  Career offender has
20    those carve-outs.  And the two carve-outs that it has are one
21    is expungements, and two are set-asides, vacating.
22        Now in this case we're talking about you have the career
23    offender guidelines where the sentencing commission says, "You
24    know what, it does matter whether a sentence has been expunged
25    at the time of sentencing.  It does matter whether a sentence
```

has been vacated at the time of sentencing." Here we are now
at the time of sentencing, and what the sentencing commission
says is that the status now matters.

So let's look at what was done here. What you have done
here, there were two requests filed, both to the same judge,
Judge Wapner. The first request, the 11359 was reduced to a
misdemeanor for all purposes. Then the public defender's
office went back a second time and received an additional
order.

And it wasn't as though Judge Wapner was not told, "Hey,
by the way, previous relief was requested, and you granted
previous relief." No, in the minute orders it even discusses
how this is a subsequent request for additional relief. And
Judge Wapner granted that additional relief, and he made two
important -- used -- the order that he signs says that the
conviction was vacated as legally invalid, vacated as legally
invalid.

Now, that goes beyond what happened before, and he
didn't -- the 11359 does not exist anymore. What was replaced
in its stead was an 11360(a) as an infraction. That offense,
the offense that does exist as an infraction is not a
categorical match to a drug trafficking offense for career
offender. That offense cannot count. There is no -- there is
no charge left. It has been erased.

Even the *Tidwell* case, that is a case that someone applied

1  for relief under California Penal Code 1203.4.  The person then

2  went and asked for relief under Proposition 47.  And what the

3  Court said was that Prop -- I'm sorry, 1203.4.  It does not

4  erase the conviction.  And so that the Prop 47 relief does

5  more, suggesting that it, in fact, erases it.

6      But Proposition 64 goes even further than Prop 47 because

7  Prop 47, which -- in which *Diaz* was involved, it makes an

8  exception.  It says it's a misdemeanor or infraction for all

9  purposes except for purposes of firearms law.  So if you get

10 Prop 47 relief, and because you had a felony you were before

11 not allowed to have a firearm, you're still not allowed to have

12 a firearm, but under Prop 64, there are no exceptions.  There

13 is no firearms exception.  It's for all purposes.

14     And even with Prop 47 -- and this is before *Diaz* was

15 decided because it was only this summer that the California

16 Supreme Court decided this.  In the *Buycks* case, in a series of

17 consolidated cases involving Prop 64 -- sorry, Prop 47, the

18 Court said that it's expansive and retroactive even in terms of

19 enhancements on other cases.

20     All of which goes to say that the set-aside here is as

21 complete as it could be.  Under *Tidwell* it's erased.  Under --

22 just looking at the differences between Prop 47 and Prop 64,

23 you can see that this is a complete getting rid of this.  And

24 given that career offender and the guideline commission wrote

25 the guidelines that basically said, "Look, we do consider what

36

1    was the status at the time.  Was it expunged?  Was it set

2    aside?"

3         And so this isn't a 1203.4 set-aside that's unrelated to

4    whether a person has performed satisfactorily.  This is a

5    matter of law.  It gets set aside completely for all purposes.

6    And the language that was used here, vacated as legally

7    invalid, fits exactly within either of these two provisions

8    within the guidelines.

9         So those -- it's very -- the language of the guidelines

10   excepts for the possibility of an expungement or set-aside or

11   being vacated.  It was not done for some nonlegal reason.  It

12   was vacated as legally invalid, so it's not unrelated in errors

13   of law, it's not unrelated to innocence because it basically

14   says a person is no longer guilty of that.

15        And given that the standard on this particular issue is

16   clear and convincing evidence, and the Government hasn't

17   brought the pleading for this second application for relief,

18   all we have is the order, and it says what it says, vacated and

19   legally invalid.  So for -- that's -- that's off the bat.

20        *Diaz*, by its own terms, does not apply to career offender.

21   These other cases -- I did cite to one case where they said --

22   I think it was the Government's district court case.  It wasn't

23   that it was not set aside, it just never was vacated, but here

24   we have the vacated language.  The point being is that vacated

25   means vacated.

**UNITED STATES DISTRICT COURT**

 1          THE COURT:  Do you have any other matters to

 2  discuss?

 3          MR. RAYNOR:  Yes, Your Honor.

 4      As to the -- there's also the issue of whether the '94

 5  conviction is too old, whether the 15 years had run, and the

 6  probation department responds by saying that they called a

 7  number, and it was confirmed verbally, but there's nobody

 8  listed there, and they didn't provide any further documents to

 9  document that.

10      And I would suggest that Penal Code Section 669 is telling

11  about the documents that would exist that we don't have here,

12  and, therefore, we don't have proof by clear and convincing

13  evidence.  Penal Code 669, California Penal Code, basically

14  says that if there are two abstracts of judgment committing a

15  person to prison and these -- the defendant is delivered to the

16  prison and he arrives with two abstracts of judgment, two

17  prison commitments, then the prison is supposed to look at that

18  and say, "Okay.  Are these running concurrent?  Consecutive?

19  How are we supposed to figure this out?"

20      And what they're supposed to do is look at the abstract of

21  judgment form and see whether or not it says "concurrent" and

22  which case it is concurrent to, or consecutive.  As I pointed

23  out in the document, the abstract of judgment on the marijuana

24  case, there is -- even though that was the last case to be

25  sentenced, it did not -- it does not mention that it's

1    concurrent and does not mention the other case number.

2          And, also, we don't have -- probation was not able to get

3    it, and apparently the Government not either, the letter that's

4    Penal Code Section 669 says that they're supposed to send to

5    the judge, the last sentencing judge, to make that

6    determination about whether it's concurrent or consecutive.

7    Because we don't have either of those two documents -- and what

8    it appears as though Mr. Shaw had completed his sentence by the

9    time he was delivered to state prison, as can be seen.

10         In any case, there's also relating to the 851, there is

11   the issue -- the further issue about whether when something is

12   vacated and set aside, whether it can still be used, it's the

13   *Clay* case that talks about how it still can be a Fifth

14   Amendment violation and Eighth Amendment violation to use a

15   vacated sentence.

16         It's also important, I think, to understand the terms of

17   what *Diaz* does not mention.  *Diaz* does not mention the

18   exception in *McNeill* or the footnote in *McNeill*.  And *McNeill,*

19   that was an ACCA case, but the Supreme Court said that if there

20   were a statute that retroactively reduced a sentence, that for

21   purposes of enhancement that could be -- that might be

22   something that would be considered at a later date.

23         And the solicitor general in that case basically conceded.

24   And the very argument was we are not dealing with a retroactive

25   statute, and, therefore, that's why we have this backwards-only

**UNITED STATES DISTRICT COURT**

1    looking view.  But -- but exactly what you have in Prop 64 is

2    something that is backward-looking, and it's for all purposes.

3         Your Honor, in terms of considering the Nebraska case, as

4    the officer who testified, he said that the court in that case

5    found that there was no probable cause and had dismissed the

6    case against Mr. Shaw.  The March 10th, 2003 incident, it was

7    acquitted conduct, and it's not relevant conduct.

8         The discussion about Mr. Shaw talking about fighting

9    people in the jail, what Mr. Shaw had said was that there were

10   rival people that were coming into the cell that wanted to beat

11   him up, and he was defending himself.  And it's not as though

12   he said, "Oh, I decided to go out and attack them."  What he

13   said was it was sometime -- I think it was early in the

14   morning, these guys are coming and going to attack him.

15        The Government mentioned what ████CI████ said that he

16   was sent the next day to go talk to people, but -- and ask what

17   they did, and the Government said, oh, well, the suspects all

18   told them what they did, including Marquis Shaw.  That's just

19   factually not correct.  That's wrong.  That's not -- because,

20   in fact, what that report says, he said, "This person said

21   this, this person said this, and this person said this," and

22   gave a list of who they were and what they said.

23        There was not -- there was not that same statement as to

24   Mr. Shaw.  And the information that they did have, the

25   informant claimed that he got it from --

**UNITED STATES DISTRICT COURT**

1        (Counsel and defendant conferred off the record.)

2        MR. RAYNOR:  -- that he claimed to have gotten that

3  information from Aaron Shaw, who was then deceased.  So, again,

4  this has to be reliable information, and it's not reliable.

5        THE COURT:  Not reliable because Mr. ██████ is not

6  reliable?

7        MR. RAYNOR:  No, because there was documentation as

8  to other people that contemporaneously -- that they had said

9  what their role was at that event, but there was nowhere in

10  that report that Marquis Shaw had likewise said, "Oh, yeah, I

11  was involved, and I was there."

12     And, in fact, the description of the car didn't match what

13  the eyewitnesses said.  We had eyewitnesses who talked about

14  the vehicles that were seen.  You had the officers who had

15  described the various -- they made -- there was, in fact, an

16  exhibit, there was a chart of the vehicles, and it didn't even

17  match Marquis Shaw's vehicle.

18     So -- and there was even contradiction in terms of the

19  description of what his involvement was, what he was driving.

20  And so it's -- whatever the Court's view is on ██████

21  ██████'s, you know, reliability generally, that's for the Court

22  to determine, but I'm talking about in this particular

23  instance, there's just not reliable evidence.  And perhaps that

24  was one of the reasons the jurors found Mr. Shaw not guilty of

25  a RICO conspiracy, you know, things like that.

**UNITED STATES DISTRICT COURT**

Case 2:14-cr-00338-GW   Document 4208-1   Filed 03/04/21   Page 41 of 64   Page ID #:32502

41

1    The Government's suggestion that Marquis Shaw was the

2    prior -- the prior Tyrine Martinez is purely speculation and

3    conjecture and is not supported by what the Court heard at

4    trial.  The Court did hear various people either guess or give

5    different opinions about -- and most of the time conflicting

6    opinions about whether Mr. Shaw had any affiliation with any

7    iteration of the Gremlins.  He certainly doesn't have any

8    Gremlins-related tattoos, and there was no -- it was all over

9    the place in terms of his alleged affiliation.

10   And for them to now come in and say he was the predecessor

11   person for Tyrine Martinez, and Tyrine Martinez -- I mean, the

12   Court heard testimony about him during the trial about how he

13   had asked somebody to kill somebody else, and he received a

14   22-year sentence.  The Government is attempting to suggest that

15   Marquis Shaw had the same role of that, and it's just not

16   supported by what was heard at the trial and the other evidence

17   that is before the Court at this time.

18   Does the Court wish for --

19   THE COURT:  I need you to conclude.

20   MR. RAYNOR:  Okay.  Your Honor, I just wanted to

21   know whether I should discuss 3553(a) at this point.

22   THE COURT:  Please.

23   MR. RAYNOR:  Thank you.

24   THE COURT:  I do have some questions for the

25   Government, but I need you to conclude.

1          MR. RAYNOR:  Thank you.

2      Your Honor, Marquis Shaw has -- what he's required -- he's

3  accepted -- he all along wanted to plead guilty to the drug

4  charges, but he didn't have that opportunity.  No offer was

5  ever made to him, and all of the other charges involved,

6  basically a life sentence.  He's not required to accept

7  responsibility for that acquitted conduct.  All that the law

8  requires is that he accept responsibility for the offense

9  conduct, but he also admitted the relevant conduct that's in

10  the -- that was referenced by the probation officer as relevant

11  conduct.

12      The Court had said, "Let the jury decide," and the jury

13  did decide.  There was not sufficient proof that this was a

14  case about violence.  And Marquis Shaw is not proud of what he

15  did, but he had moved -- he was -- but he is not the person

16  that the Government says he was, and the jury agreed.  And

17  looking at what other people received in this case, people with

18  offenses of conviction with -- far more serious, the Government

19  is asking for much more than that in this case.

20      One other point I wanted to mention as to the Government's

21  request for supervised release for a period of 16 years.  We

22  object to that calculation because, first of all, the 851s do

23  not double either of those two offenses.  Neither of those

24  offenses is a mandatory minimum offense.  So it's not one

25  subject to the initial doubling that they would then double

 1   again.

 2        And we renew all of our objections and ask that the Court

 3   sentence Mr. Shaw appropriately for the offense conduct and the

 4   actual relevant conduct.  And as to increasing the amount of

 5   drugs to some larger amount, in particular reducing it by such

 6   a large amount, it's just not something that's reliable.  He

 7   doesn't have a conviction for anything involving a large amount

 8   of drugs.

 9        And the one -- and the instances here, we're talking most

10   of these -- most of these transactions we're talking 6 grams,

11   9 grams, 12 grams.  One of them was 40-something grams, but all

12   of them were smaller amounts.  And so to -- and given

13   particularly there was not even a finding of probable cause in

14   the Nebraska case, that is not reliable to calculate such a

15   great amount.

16        And then in terms of the amount of money that was in the

17   house, there's no -- there was no discussion about whose money

18   that was.  There were other people that were present in that

19   house that        CI        didn't recognize.  So these are

20   people he doesn't know.  He doesn't know if it's their money,

21   and it wasn't counted.  Basically it's -- yes, it's an

22   impressive visual, but we don't know, and it would just be

23   speculation to say otherwise.

24        And for that reason we would ask for the Court to consider

25   a sentence that the Court believes is appropriate for this

**UNITED STATES DISTRICT COURT**

44

1    distribution conduct.  Thank you.

2            THE COURT:  Does your client have any statements to

3    make?

4            MR. RAYNOR:  Yes.

5            THE DEFENDANT:  Yeah, Your Honor, I just would like

6    to say, you know, being that when I first came here and I told

7    you, I told the lawyer that the only involvement I was involved

8    in was the drug selling.  Anything else, I didn't have nothing

9    to do with.  And I stayed up on it, and for the Government to

10   proceed that I was involved in this, and I was involved in

11   that, I don't know what really took place, but I never had

12   no involvement in nothing else.

13      Now, I throw myself at the mercy of the Court for selling

14   the drugs.  I sold the drugs.  I admit to him I sold the drugs.

15   I'm not proud I sold the drugs, but I sold them.  And I want to

16   take my responsibility for selling the drugs.  But

17   responsibility for somebody else or what somebody else done

18   that I didn't have no involvement in, I don't know how you

19   perceive or how you want to put it, but I had no involvement in

20   nothing else, and I just throw myself at the mercy of the Court

21   just for the things I did and not for nothing what nobody else

22   did.

23           THE COURT:  Okay.  Thank you.

24      So let me ask counsel here, Mr. Raynor has taken the

25   position that the Court should not and possibly cannot consider

**UNITED STATES DISTRICT COURT**

Case 2:14-cr-00338-GW  Document 4203-1  Filed 03/22/21  Page 46 of 64  Page ID #:37504
Case 2:14-cr-00338-GW  Document 4203-1  Filed 03/22/21  Page 45 of 64  Page ID #:37504

45

1    the murders or killings of L.R. and W.S. and the other acts of

2    violent behavior because they're not related to any of the

3    counts of conviction.  So what's your response to that?

4           MR. SHINER:  Yes, Your Honor.  We addressed that in

5    the meaning of relevant conduct under 1B1.3 in our papers.  The

6    defendant is saying that we are trying to relitigate the trial.

7    We're not; we're litigating a sentencing.

8       And the Court is being asked by the defendant to ignore

9    facts that were presented at trial that this Court heard and

10   assessed and was able to evaluate on its own personally and is

11   saying that you cannot do that, to limit the Court's discretion

12   in sentencing, when 1B1.3 allows you to include in sentencing

13   determinations any conduct that is part of a series of

14   transactions or that is part of that course of conduct.

15      This concept is just contrary to the Supreme Court's

16   jurisprudence on this that says that an acquittal in a criminal

17   case does not preclude the Government from relitigating an

18   issue --

19           THE REPORTER:  Slow down.

20           THE COURT:  I understand that the Government can

21   relitigate issues that -- where a defendant was acquitted

22   because there's a different standard that applies.  I think

23   Mr. Raynor's point is a little bit more nuanced in that as a

24   technical matter, relevant conduct in this case does not

25   include the murders because they are not related in any way to

46

1    the counts of conviction.

2           MR. SHINER:  Right.  And the reason that is

3    incorrect is because of 1B1.3, the defendant says there's no

4    hook.  Our hook is 1B1.3 and 3553(a).  And I'm asking the Court

5    again to consider the murders under both purposes, but in 1B1.3

6    it says in the case of jointly undertaken criminal activity,

7    such as a criminal plan, scheme, endeavor or enterprise

8    undertaken by the defendant in concert with others, whether or

9    not it's charged as a conspiracy, all acts or omissions of

10   others that were within the scope of the jointly undertaken

11   criminal conspiracy in furtherance of it and reasonably

12   foreseeable.

13       I believe the Court began its remark that it believed the

14   jury in this particular case got it wrong; you do think the

15   defendant was engaged in racketeering conspiracy or drug

16   conspiracy.

17           THE COURT:  Yes.

18           MR. SHINER:  I think there is --

19           THE COURT:  I did say that.

20           MR. SHINER:  I believe there is clear and convincing

21   evidence of that.

22           THE COURT:  Sorry.  I did say that, but the jury

23   acquitted the defendant of those counts, and it convicted

24   Mr. Shaw of only of the discrete counts of Count Twelve,

25   Fifteen and Seventeen, Count Twelve being distribution of

1    cocaine and then Count Fifteen and Seventeen distribution and

2    possession with intent to distribute controlled substances near

3    the schools and parks, but very discrete acts.

4         MR. SHINER:  Even the probation office understands

5    that those discrete acts of dealing drugs were part of a larger

6    course of conduct in dealing drugs.  They included other drug

7    deals that weren't alleged as counts of conviction.

8         And what we have here, if you look at the relevant

9    conduct, is a large-scale drug trafficking conspiracy that has

10   been documented over the course of several trials and many plea

11   agreements.  We have that as a basis of racketeering

12   conspiracy, a racketeering enterprise that primarily made its

13   money from drugs, that's been documented in countless pleas and

14   admissions and in the trials.

15        We have ample evidence that those conspiracies existed,

16   and these -- this conduct, the violent conduct that we allege,

17   that we presented evidence of at trial, was part of those

18   conspiracies.  And the defendant's argument is essentially that

19   these facts that you are aware of that you've learned can't be

20   considered, that the Court's discretion is limited and should

21   be limited not only under the guidelines, but under 3553(a),

22   but that's just not the case.  The guidelines allow this

23   relevant conduct to be considered just as the Court would

24   consider the defendant's sentencing letters.

25        THE COURT:  And then Mr. Raynor's point as to the

1   11359 conviction, the prior conviction, which is a predicate

2   count for career offender, that the determination by the

3   superior court judge that the prior sentence was -- or prior

4   conviction was legally invalid is the same as -- I think that's

5   his point; it's the same as being constitutionally invalid.

6           MR. SHINER:  It's not.  There's no constitutional

7   defect, and the defendant hasn't alleged one.  And under career

8   offender, what is required is that it be expunged, so as you

9   said, either as a legal invalidity or it is constitutionally

10  invalid.  But if you look at the text of the statute, now, this

11  was possibly creative lawyering, defendant went back to state

12  court, got a form order, didn't like it, added the words

13  "legally invalid" in their own proposed order and got the Court

14  to sign it.  But even under that statute it says that you may

15  receive -- have a conviction dismissed and sealed because the

16  prior conviction is now legally invalid or redesignated as a

17  misdemeanor or infraction, not both.

18      This was redesignated under the law as an infraction.  It

19  didn't cease to exist.  He added the words "legally invalid,"

20  but there's no explanation for it.  There's no claim that it's

21  a constitutional issue.  There's no claim, for example, that he

22  didn't have an attorney or access to a jury trial or there was

23  other due process violation.

24      What it was was a form motion under a statutory procedure

25  that allowed for this conviction to be reduced.  But, moreover,

1   again, the defendant is asking for this Court to ignore the
2   historical fact, and that is what the inquiry is under the
3   career offender guideline, that the conviction occurred and was
4   final and then he committed the offense.  So at the time of the
5   commission of this offense, that conviction was final.
6       It's different from *Johnson.*  It's different from the
7   *Johnson/Custis* line of cases, which I did not say that the *Clay*
8   case relied on the armed career criminal.  I said the *Clay* case
9   relied on *Johnson*, which was an armed career criminal case, a
10  2255 case, and that's a different statute with a different
11  standard for what is defined as a prior conviction.  It's
12  irrelevant here, and it's stayed on appeal that I believe might
13  be overturned.
14      The standard here is that historical facts are determined
15  at the time of the commission of the offense.  And what
16  defendant wants this Court to do is open the door for every
17  defendant who comes before this Court in a similar case to go
18  back to state court, try to change history and have it affect
19  their sentence, not due to anything related to constitutional
20  issues or their own culpability, but because they know that as
21  a technical matter it might influence a court.
22      Well, changed history shouldn't matter.  Changed history
23  as to his criminal history doesn't matter, and ignoring the
24  historical facts of his conduct shouldn't matter.  The
25  defendant wants us to ignore not just his convictions, but what

**UNITED STATES DISTRICT COURT**

Case 2:14-cr-00338-GW Document 4283-1 Filed 03/22/21 Page 51 of 64 Page ID #:37509
Case 2:14-cr-00338-GW Document 4283-1 Filed 11/30/18 Page 50 of 64 Page ID #:32509

50

 1    we learned about the Luis Roches/the William Sherman murders.

 2    You can't change history about those.

 3        The William Sherman murder was corroborated not only by

 4    all the information that corroborated ███████ CI ███████ that I

 5    mentioned, but Joshua Perez, who pled guilty during trial.  He

 6    in coded -- in coded language in his factual basis identified

 7    the driver, identified the driver, and that driver was Marquis

 8    Shaw.

 9        This particular murder was very well documented and

10    presented at this trial.  The Court can make its own

11    independent assessment of whether that documentation and the

12    corroboration is convincing, but we never said that Marquis

13    Shaw told ███████ CI ███████ himself that he did it.  We said he

14    received accounts of what happened, and every single account

15    was corroborated in every way that the task force could think

16    of doing it.

17                THE COURT:  Mr. Raynor, do you have any response?

18                MR. RAYNOR:  Yes.  The Court had inquired about

19    whether constitutionally invalid -- constitutional invalidity

20    is not required.  It either expunged or set aside in a way

21    that's not unrelated to innocence or legal errors.  Here, legal

22    invalidity is akin to legal errors.  And also based upon -- and

23    so it fits within it.  And certainly on a clear and convincing

24    evidence standard, they have not shown that it's not, given the

25    language appears to be pretty broad.  And to say, oh, the

1   people can go back and challenge priors --

2           THE COURT:  That's your duty, if you can do that.  I

3   understand that.

4           MR. RAYNOR:  Right.

5       And, Your Honor, just one final point.  If the Court would

6   find that he is a career offender, there is 4B1.1 Application

7   Note 4 that says that if one or more of those two predicate for

8   career offender is a misdemeanor at the time of sentencing,

9   which meaning right now, that the Court can use that as a basis

10  for downward departure.

11          THE COURT:  Anything further?

12          MR. RAYNOR:  No, Your Honor.

13          MR. SHINER:  Yes, I'm glad that counsel mentioned

14  that.  It is a basis for a downward departure.  He can

15  certainly consider that the cases were later reduced, but the

16  fact -- the very fact that that comment exists and says that

17  convictions at the time of sentencing have been reduced to

18  misdemeanors may be considered indicates that the entire

19  argument that the guidelines don't apply to felonies that are

20  later misdemeanors is incorrect.  They are subject to your

21  discretionary departure, but they still mean he is a career

22  offender.

23      But I keep coming back to the 3553(a) factors.  And I said

24  it at the beginning, I will say it again now, the Government

25  would advocate for the same sentence whether or not the

 1   technical application of the career offender guideline applied.

 2   And I will ask the Court under relevant conduct or whether or

 3   not the murders constitute relevant conduct, I would ask the

 4   Court under 3553(a) to take those into account, which it is

 5   clearly within your discretion to do, and sentence him under

 6   3553(a) to what is the guideline sentence now of 35 years.

 7             THE COURT:  Thank you.

 8             MR. RAYNOR:  Your Honor, can I just respond briefly

 9   to --

10             THE COURT:  Sure.

11             MR. RAYNOR:  The Government says, well, the fact

12   that there's that 4B1.1 Application Note 4 means that that's

13   the only way to do it.  It doesn't.  I mean, you can go under

14   1203.4, and under the terms of this application note you would

15   still -- there would still be a basis for departure.  And what

16   we're saying is there's much more, and basically what qualifies

17   under the other provisions for either an expungement, which is

18   essentially erasing, and that's what you have here.

19        And just one other brief point because the Government had

20   said that Joshua Perez's plea agreement should be considered

21   and that there's some kind of coded language in there.  That's

22   just not reliable, the type of reliable thing that this

23   co-defendant's plea agreement -- some coded language that we

24   know nothing about, and I'm hearing about for the first time

25   right now, is -- you know, that somehow is implicating Mr. Shaw

53

1    when there really is just no reliable evidence of that for any
2    purpose.

3              THE COURT:  So let's start with the objections.  The
4    Government has objected to the PSR's failure to include various
5    trial exhibits and some of the defendant's most egregious
6    conduct.  The Court agrees that there should have been more
7    detail in the PSR regarding some of the most egregious conduct
8    of the defendant.  That being said, I'm not going to refer this
9    back to the probation department to supplement.

10             The second objection is the Government objects to the
11   calculation of drug amounts for which the defendant is being
12   held accountable.  And the assertion here is that the defendant
13   should be held accountable for 2.8 kilograms of crack cocaine
14   dating back to 2002.  The Court is going to sustain that
15   objection.  There is clear and convincing evidence by any
16   measure that the defendant was involved in far more than -- far
17   more drug distribution and manufacturing in crack cocaine than
18   the PSR held him responsible for, so the Court is going to
19   sustain that objection.

20             The Government also objected in the footnote to the PSR's
21   failure to account for the defendant's violent conduct,
22   including his -- the conspiracy to commit murder and the
23   manslaughter for which the defendant was convicted in state
24   court, but the jury in this case acquitted the defendant of the
25   RICO count.  I'm going to address that in the 3553 factors.

54

1    The Government objected to the supervised release

2    calculation.  The Government references that the minimum

3    mandatory is 16 years if the defendant is a career offender,

4    involving counts Fifteen and Seventeen.  The Court will sustain

5    that objection.

6    The Government has advocated for a sentence of 420 months,

7    which the Court will address in the 3553 factors.  In reference

8    to defendant's objections, the defendant objected to the PSR

9    application of career offender guideline status based on three

10   grounds:  the first is that the September 6th, 2016 conviction

11   for the 11359 in superior court, sale of marijuana is -- cannot

12   form a basis as a predicate offense because it was found to be

13   legally invalid by the superior court at a later date.  The

14   Court is going to overrule that objection.

15   The second claim is that the 11359 is too old.  The Court

16   is going to overrule that objection for the reasons referenced

17   in the addendum.  And then the third is that the case law

18   requires the Court to -- for the Court not to consider that as

19   a predicate offense, and the Court is going to conclude there

20   is no persuasive case on point requiring this Court to

21   disregard the 11359 offense, so the Court is going to overrule

22   that objection.

23   The defendant also objected to the claim that the

24   voluntary manslaughter is not a crime of violence within the

25   meaning of career offender guideline.  That was addressed in

 1    the probation officer's addendum, and the Court is going to

 2    overrule that objection for the reasons stated.

 3         The defendant has objected to the prior felony convictions

 4    filed under 851.  The Court is going to overrule that

 5    objection.  And then the defendant objects to the PSR's failure

 6    to calculate -- to include a reduction for acceptance of

 7    responsibility.  The Court agrees that the defendant does not

 8    qualify for acceptance of responsibility.  He has not accepted

 9    any responsibility for -- except for the counts of conviction,

10    for any of the other related conduct in this case.  And the

11    Court is -- finds that he is not entitled to an adjustment for

12    acceptance of responsibility.

13         The defendant also objected to certain inaccurate factual

14    information.  The Court declines to rule.  It's not important

15    to the sentence imposed by the Court.

16         A couple of comments.  I've had -- I've had this case for

17    a number of years now.  I have had the opportunity to preside

18    over some trials in the case.  I've had the opportunity to

19    review the conduct of many of the defendants in the case.  I

20    agree with the Government that Mr. Shaw is one of the most

21    sophisticated members of the gang.  He's one of the most

22    culpable members of the gang and presents a clear danger and a

23    continued danger to the community.

24         In reference to the testimony of Mr. ███████CI███████, I

25    would just comment that, for the most part, I tend to dismiss

1   the testimony of cooperating witnesses who have much to gain in

2   their endeavor to cooperate with the Government in seeking

3   reduced sentences.  That being said, that testimony is often

4   considered if it's corroborated.  Personally, I thought

5   Mr. ▮CI▮'s testimony in this case was some of the most

6   compelling I've ever heard from a cooperating witness.  He

7   appeared to be extremely honest and forthright.  He expressed

8   his reasons why he was testifying on behalf of the Government.

9   I thought his testimony was convincing and persuasive and

10  compelling.

11       So the Court is going to sentence the defendant as

12  follows:  Having considered the sentencing factors enumerated

13  in Title 18 3553, the advisory guideline range, based upon an

14  offense -- a guideline range of 360 to life imprisonment, the

15  Court would adopt the finding in the PSR that the offense level

16  is 37.  The base level the Court is going to conclude is 34.

17  The defendant should be held accountable for at least 2.8, I

18  think that's a conservative measure, of cocaine, by any

19  calculation.

20       The defendant was not only a supplier, but also a

21  manufacturer of cocaine for a number, number of years, and

22  profited significantly in light of the evidence which depicted

23  him with a significant amount of money in his kitchen, which

24  the Court concludes was his money because it appeared that it

25  was his money.

1    The following would be ordered:  It is ordered that the

2  defendant shall pay to the United States a special assessment

3  of $300 due immediately.  Any unpaid balance shall be paid

4  during the period of imprisonment at the rate of not less than

5  $25 per quarter.  All fines are waived.  He does not have the

6  ability to pay a fine.

7    Pursuant to the Sentencing Reform Act of 1984, it is the

8  judgment of the Court that the defendant is committed on Counts

9  Twelve, Fifteen and Seventeen to the -- on the second

10 superseding indictment to the custody of the Bureau of Prisons.

11 The Court is going to follow the recommendation of the

12 Government and sentence the defendant to 420 months.  The term

13 consists of 420 months -- let me check the maximum on

14 Count Twelve.

15   Let me just turn to the Government.  What is the maximum

16 penalty on Count Twelve?  Let me find it.  Let's see.

17       MR. SHINER:  It's 40, Your Honor, it's in the PSR.

18       THE COURT:  Yeah, let me look in the PSR.

19   There's so many pages.

20       MR. SHINER:  When I say it's 40, that's without the

21 prior.  The Court is finding the prior true, so that's life

22 imprisonment.  So that's paragraph 102.

23       THE COURT:  Thank you.

24   So the term consists of 420 months on Counts Twelve,

25 Fifteen and Seventeen of the second superseding indictment to

1  be served concurrently.  The 420 months shall be served

2  concurrently to the defendant's undischarged term of

3  imprisonment under Los Angeles Superior Court case number

4  YA089324.

5       Upon release, he shall be placed on supervised release for

6  a term of 16 years.  The term consists of 8 years on

7  Count Twelve and 16 years on Counts Fifteen and Seventeen of

8  the second superseding indictment, all terms to run

9  concurrently.

10       The defendant shall comply with rules and regulations --

11  under the following terms and conditions:  comply with rules

12  and regulations of the U.S. Probation Office in General Order

13  05-02, with the exception of Conditions 5, 6 and 14; not commit

14  any violation of local, state, federal law or ordinance;

15  refrain from unlawful use of a controlled substance; submit to

16  one drug test within 15 days of release, at least two periodic

17  drug tests, not to exceed eight tests per month.

18       The defendant shall participate in outpatient substance

19  abuse treatment and counseling that includes urinalysis, breath

20  and sweat-patch testing; abstain from using drugs, using

21  alcohol or abusing prescription medication.  The defendant

22  shall cooperate in the collection of a DNA sample.

23       The defendant shall not associate with anyone known by him

24  to be a member of the Broadway Gangster Crips and any others

25  known to him to be participants in the Broadway Gangster Crips

59

criminal activities, with the exception of family members; not

wear, display, use or possess any gang insignias, emblems,

badges, buttons, caps, hats, jackets, shoes or any other

clothing that the defendant knows evidence affiliation with the

Broadway Gangster Crips.  He may not display any signs or

gestures that defendant knows evidence affiliation with the

Broadway Gangster Crips.

     As directed by the probation officer, the defendant shall

not be present in any area known by him to be a location where

the Broadway Gangster Crips regularly meet.  He shall submit

his person to search at any time, and including his property,

house, residence, vehicle, papers, computers, cell phones,

other electronic communication, data storage devices, other

effects and other areas under defendant's control upon a

reasonable suspicion concerning a violation of the terms and

conditions of supervised release by a probation officer in the

lawful discharge of the probation officer's duties.

     The probation officer shall notify specific persons and

organizations of specific risks, and shall permit the probation

officer to confirm the defendant's compliance with such a

requirement and to make such notification.

     In sentencing the defendant the Court has considered the

3553 factors.  The Court recognizes that defendant is now

approximately 43 years old.  The sentence imposed by the Court

takes into consideration the relevant conduct that the Court

 1    believes the defendant should be held responsible for,

 2    including the murder of L.R., his involvement in the murder of

 3    W.S., the defendant's violent criminal conduct while he was in

 4    custody.

 5         The Court notes that the defendant has 11 criminal

 6    convictions.  The number of criminal history points is 18.  The

 7    defendant's prior convictions include drug trafficking in 1994

 8    and 2001, as well as violent offenses such as the manslaughter,

 9    which we already discussed, in 2003.  He was sentenced for

10    seven years.  The assault with a firearm on a person in 2014,

11    he was sentenced to eight years in prison.

12         The record reflects that he served time in custody in the

13    California Youth Authority, so he has a long history of

14    committing criminal and some -- and often violent criminal

15    acts.  The defendant's 2003 manslaughter case was especially

16    egregious here, the Court having the opportunity to witness or

17    hear the testimony that was provided, but the persons in the

18    other vehicle were essentially gunned down for simply

19    committing an act of insulting the defendant and his

20    companions.

21         The Court respects the conclusions of the jury in

22    reference to the counts that he was acquitted on.  The Court, I

23    would say for the record, that separate and apart from whether

24    the defendant qualifies as a career offender, and the Court

25    would find the 581s to have been established, the Court would

1　sentence the defendant under the 3553 factors to the same

2　sentence imposed by the Court if it's concluded at a later date

3　that defendant, for technical reasons, does not qualify as a

4　career offender.

5　　　　Any recommendation as to where he should be housed?  And

6　obviously you're going to file notice of appeal, so you are

7　directed to file notice of appeal forthwith.

8　　　　　　　MR. RAYNOR:  Yes, Your Honor.

9　　　　　　　THE COURT:  Or as soon as you can.

10　　　I want to compliment Mr. Raynor.  Mr. Raynor, you have

11　been a vigorous advocate for your client.  I think you did a

12　remarkable job in front of the jury.  We had some very

13　intelligent people on the jury, one being a former law clerk

14　for one of the judges in this court, and your strategy and your

15　conduct, I think, was always professional.

16　　　You have advocated extremely well on behalf of your client

17　in terms of the sentencing, raised some significant issues that

18　I'm assuming will be addressed on appeal, and I would

19　compliment you for your demeanor and your professionalism

20　exhibited in the Court.

21　　　And then recommendations?

22　　　　　　　MR. RAYNOR:  Yes, Your Honor.  Mr. Shaw would ask

23　the Court to recommend to the Bureau of Prisons that he be

24　designated in Southern California.

25　　　　　　　THE COURT:  The Court would recommend a facility in

**UNITED STATES DISTRICT COURT**

62

```
 1   Southern California.
 2        Anything further?
 3             MR. RAYNOR:  No, Your Honor.
 4             THE COURT:  For the Government?
 5        You have a right to appeal your sentence if you feel your
 6   sentence is contrary to law.  Mr. Raynor is going to file a
 7   notice of appeal on your behalf, and that has to be filed
 8   within 14 days from today's date.
 9        Government?
10             MR. SHINER:  Nothing further, Your Honor.
11             THE COURT:  Anything further to be dismissed?
12             MR. SHINER:  We will dismiss the underlying first
13   superseding and original indictment.
14             THE COURT:  Both are granted, both motions are
15   granted.
16                  (Proceedings concluded at 12:33 p.m.)
17                          ---oOo---
18
19
20
21
22
23
24
25
```

**UNITED STATES DISTRICT COURT**

1      **CERTIFICATE OF OFFICIAL REPORTER**

2

3 COUNTY OF LOS ANGELES )
           )
4 STATE OF CALIFORNIA  )

5

6     I, CAROL JEAN ZURBORG, Federal Official Realtime

7 Court Reporter, in and for the United States District Court for

8 the Central District of California, do hereby certify that

9 pursuant to Section 753, Title 28, United States Code that the

10 foregoing is a true and correct transcript of the

11 stenographically reported proceedings held in the

12 above-entitled matter and that the transcript page format is in

13 conformance with the regulations of the judicial conference of

14 the United States.

15

16 Date:  November 30, 2018

17

18

19        /s/ CAROL JEAN ZURBORG

20     _____
     CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
21       Federal Official Court Reporter

22

23

24

25

**UNITED STATES DISTRICT COURT**